IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TUAN C. FIELDS, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL NO. 11-856-GPM |
| | ) |
| J. MILLAN and MISTY THOMPSON, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**MURPHY, District Judge:**

Before the Court is Defendants' motion for summary judgment (Doc. 32) to which Plaintiff has responded. Defendants' motion is **GRANTED** and Judgment in this case will enter for Defendants.

Factual Background

On September 22, 2011, Plaintiff filed a Complaint alleging that Defendant Jay McMillan, a correctional officer, deliberately shot him – he states that he was hit with buckshot pellets in his arm and nose – while he was an inmate at the Menard Correctional Center. Plaintiff further alleges that Misty Thompson, a nurse, ignored his request for medical treatment. Plaintiff has two claims: excessive force against Defendant McMillan and deliberate indifference to a serious medical need against Defendant Thompson.

The evidence is that on October 10, 2010, a fight broke out between an inmate, Sartin, and

two correctional officers, Edwards and Eovaldi, in front of inmate Sartin's cell on the 5 Gallery in the East Cell House at the Menard Correctional Center. At the time, Defendant McMillan was on the catwalk of the East Cell House and he verbally directed inmate Sartin to stop fighting. When Sartin refused the order and continued to fight, Defendant McMillan fired a warning shot onto a "shot board" on the 9 Gallery in the East Cell House. This shot board is located between cells 920 and 921. Plaintiff was housed in cell 922. Plaintiff states that he was struck in the nose and arm by buckshot. After being struck, Plaintiff caught the attention of Defendant Thompson who was passing by his cell in order to attend the medical needs of another inmate. Plaintiff showed Defendant Thompson his injuries; and, according to Plaintiff, she merely instructed him to "wash it off."

> In describing the incident on October 10, 2010, Plaintiff testified that:
>
> Well, after returning from chow, after returning from chow October 10, 2010, after entering the cell, I guess a fight had broken out on 5 Gallery. I'm on 9 Gallery, 922. I guess a fight had broken out. Maybe some officers had tried to break it up or what have you, or maybe some officers was involved. I don't know, 'cause I'm not on 5 Gallery; I was on 9 Gallery.
> So the officer – the scuffle was going on. I'm inside my cell. That has nothing to do with me. Next thing you know, I hear a gun go off. While I was standing in the cell, talking to my cellie, I hear a gun go off, and next thing you know, I'm hit by fragments and pellets.

(Doc. 32-2, Tuan Fields Deposition pp. 13-14). Plaintiff could not see the fight and did not know who was involved; but, he did see Defendant McMillan shoot in his peripheral vision (*Id.* at 26, 32). While Plaintiff believes that the shot was fired because of the altercation on 5 Gallery, (*Id.* at 33), Plaintiff nonetheless believes that Defendant McMillan shot at his cell deliberately:

> Q. Okay. Do you think he was trying to shoot at the shot board and just missed?
> A. No. Because my cell, my cell is before, before the – like the target board it somewhere located by 920 and 921.
> Q. How far is that from your cell?
> A. Uh, I don't know. Maybe five, six feet.

>    Q. So pretty close, though.
>    A. No, it's not pretty close. It's three cells difference. So it's not like it's close to my cell at all. He could've shot that target board as they'd previously done. Then those buckshots go or those fragments go to 920 and 919 or that cell. All the fragments was in 921, 922, 923 . . .

(*Id.* pp. 28-29). Inmate John E. Searles, who was confined to cell 924 stated that Defendant McMillan "was pointing his gun towards 9 Gallery cells" and "was not aiming the gun at the shot board" (Doc. 39, John E. Searles Affidavit ¶¶ 6-7). Another inmate, Michael Jackson, M10479, stated in his affidavit that "[t]he officer yelled get on the ground and fired toward my cell [#922] at a target board, on 9 gallery cell 22 Easthouse" (Doc. 39, Michael Jackson Affidavit p. 1). Both Mr. Searles and Mr. Jackson stated that they were also hit by pellets. Plaintiff further testified:

>    Q. But you didn't see him aim his gun before he fired the shot, did you?
>    A. No, I did not. I didn't see him aim his gun.
>    Q. Okay. So you couldn't tell where he was intending to shoot; correct?
>    A. Excuse me?
>    Q. You couldn't tell where he was intending to shoot? You didn't see where –
>    A. Out of the corner of my eye, I could just see him raising his gun and just firing.
>    Q. Okay. Where do you think he was intending to shoot?
>    A. If you ask me, I think he was just nervous and just shot the gun. He was nervous and he shot the gun, and he deliberately shot it into my cell. I can't I can't see no other reason for him to shoot into my cell.

(Fields Dep. p. 33-34).

Plaintiff can only guess as to why Defendant was nervous and he has no knowledge why Defendant McMillan would want to shoot into his cell (*Id.* at 36-37). Plaintiff did not know or speak to Defendant McMillan prior to the shooting; and, after a brief interaction on the day of the shooting, Plaintiff has not seen him again (*Id.* at 91-93). Defendant McMillan states that he fired a warning shot in response to the fight and that he "cleanly and directly hit the shot board on nine (9) gallery in the east cell house to stop the fight and maintain and restore discipline" (Doc. 32-1,

Jay McMillan Affidavit ¶ 8). Defendant McMillan further states that the shotgun shell contained nine (9) pellets that were .32 inches in diameter (*Id*. at 9). And, finally, that he did not shoot or intend to shoot Plaintiff (*Id.* at 11).

Plaintiff states he sustained injuries "[f]rom those pellets and those fragments that came and entered my cell and hit me, bounced off the wall and hit me and my cellie" (Fields Dep. p. 29). Plaintiff was hit by 5 pellets/fragment, three went into his arms, and two lodged in nose (*Id.* at 38). The pellets/fragments caused his nose to bleed and welts to raise on his arms (*Id.* pp. 40-41). The pellet (which he describes as being flat) from his nose fell out at some point in late 2010, early 2011 when Plaintiff was at Stateville Correctional Center (*Id.* at 50-51). As for lasting injuries:

> I mean, I still have marks from them. I still have marks from the wounds, and I still have, you know what I'm saying, a little dent under my nose a little bit. And like the nostril in the back is not like this nostril. Now it's like this right nostril is like open more, and this one is like you can see like the little whatever, I don't know what they call it back there, but you can see back there, it's like from time to time it'll be stuffy on one side or the next time be stuffy on this side, and I can't breathe out of one side, breathe like the other

(*Id.* p. 41). The injuries also cause Plaintiff's nose to bleed, gives him headaches, causes him to "snorkel a lot now," causes his nose to "run continuously," and has given him mental anguish. (*Id.* at 45).

With respect to medical care, after the shooting, Plaintiff told his gallery officer, Correctional Officer Bishop, that he required medical treatment (*Id.* at 57-58). In particular, Plaintiff states that he showed Officer Bishop his injuries (the welts and nose bleed), that he was not in excruciating pain, but that his nose was hurting and his eyes were watering (*Id.* at 59-60). Shortly thereafter, while Plaintiff was watching TV, Defendant Thompson walked through the

gallery (*Id.* at 66). Plaintiff stopped her to indicate he needed medical care: Defendant Thompson told him that she would return after she completed handing out medication (*Id.* at 66). When she returned, Plaintiff told her of the incident, stated he got hit by pellets, showed her a bloody tissue and t-shirt (presumably from his nosebleed), and showed her the welts: Plaintiff states that she "laughs and tells me, wash it off with soap and water and everything will be fine" (*Id.* at 67-68). Defendant Thompson states that she remembers observing an inmate on October 10, 2010 who stated he had been shot in the face but that she did not see any visible injuries and told the inmate to submit a sick call request if he had further complaints (Misty Thompson Affidavit ¶¶ 4-5).

When Officer Bishop came back an hour-and-a-half later, Plaintiff again asked for medical care – Officer Bishop stated that he has done all he can do (*Id.* at 72-73). Plaintiff submitted a written request that was sent back to him on October 22, 2010 and then sent another request stating that he needed to be checked out to insure he didn't have an infection – he received no response or attention (*Id.* at 73). Plaintiff made 1 or 2 other oral attempts to acquire medical attention shortly after the incident but then gave up and made no requests of any of the nurses who made regular (daily) medical rounds in the gallery where he was housed. (*Id.* at 75-77). There is no showing in the record that Plaintiff sought any additional medical care from Defendant Thompson or that she was aware of his other medical requests. Plaintiff finally saw a doctor in mid- 2011 (after the pellet fell out of his nose), Dr. Nwaobasi, who gave him a nasal spray and ordered x-rays of his nose after conducting a physical examination (*Id.* at 74,80). Plaintiff was told that the x-rays did not reveal any foreign object in his nose (*Id.* at 81). Plaintiff's only interaction with Defendant Thompson was on the day of the shooting (*Id.* at 97).

Discussion

Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FEDERAL RULE OF CIVIL PROCEDURE 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). *See also Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

In order to prevail on an Eighth Amendment of cruel and unusual punishment in the form of excessive force, Plaintiff must show that the force used was to "maliciously and sadistically [ ] cause harm" rather than in a "good-faith effort to maintain and restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992). Importantly, inadvertence and negligence do not set forth an

Eighth Amendment claim, s*ee Wilson v. Seiter*, 501 U.S. 294, 297 (1991): Plaintiff must show that there was "*actual intent* or *deliberate indifference* on the part of the state actor in order to make out an eighth amendment claim." *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (citation omitted, emphasis in original); *See also Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012) (stating that "negligence or gross negligence is not enough" and that "plaintiff must establish that prison officials acted wantonly"). Thus, this Court must "inquire into the state of mind of prison officials who have allegedly caused a constitutional violation." *Id.* at 1065.

In this case, Defendant McMillan shot his shotgun in response to the altercation that was occurring on 5 Gallery. There is no evidence he had any intent to harm Plaintiff. Plaintiff states that Defendant McMillan shot in his direction, but he did not intentionally fire *upon* Plaintiff. Plaintiff readily admits that he has no history with Defendant McMillan that would evidence a motive, that he did not actually know precisely where Defendant McMillan was aiming his shotgun (and neither do the other inmates who provided affidavits), and he believes that Defendant McMillan shot the gun because he was nervous. Moreover, it appears from the evidence that Plaintiff was hit with smaller fragments of pellets rather than the 1/3 inch buckshot itself. There is no showing, then, that Defendant McMillan acted "maliciously and sadistically to cause harm." At most, Plaintiff may have established that Defendant McMillan was negligent (or even grossly negligent) in failing to line-up his shot in order to hit the shot board (or that the shot board itself was defective in allowing buckshot fragments to ricochet into cells) – such a showing, however, is insufficient to prevail on an Eighth Amendment claim of excessive force.

In a similar factual scenario, in *Gomez v. Randle,* the Seventh Circuit found the plaintiff stated a claim when "[t]he unidentified officer on the catwalk fired two shotgun rounds at inmates

who were not involved in the fight and located four cells away. In addition, Gomez asserts that the two inmates involved in the fight were unarmed…there are enough factual allegations to infer that the unidentified officer acted maliciously in using deadly force against inmates who were not involved in the ongoing altercation." *Gomez,* 680 F.3d at 864-65. In this case, as opposed to *Gomez* where the court inferred an intentional shooting, Plaintiff has not established that Defendant McMillan intended to cause him harm or that the force employed was even directed at Plaintiff's conduct.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). The following circumstances could constitute a serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie County,* 394 F.3d 510, 512-513 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

Second, a prisoner must show that prison officials acted with a sufficiently culpable state

of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Put another way, the Plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citations omitted). A plaintiff does not have to prove that his complaints of pain were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). "Even if the defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843).

Defendants argue that there is "no evidence" that Plaintiff was struck by pellets from the shotgun. Plaintiff's evidence is his testimony that he was stuck by pellets/fragments after the shot

that caused welts and a bloody nose. Dr. Nwaobasi ordered an x-ray of his nose, presumably based on Plaintiff's complaint that he was struck there with the pellets/fragment. There is insufficient evidence of a serious medical condition or that Defendant Thompson was deliberately indifferent to such a need. According to Plaintiff the pellets/fragments caused welts on his arm and his nose to bleed. There is no showing that Plaintiff was in significant pain, that he was actively bleeding when he was observed by Defendant Thompson, or that there were any other appreciable physical signs that he was in distress. Medical records reveal that during a "routine" sick call a few days after the shooting (on October 13, 2010), there were no current complaints, deformities, or other notable problems (Doc. 32-4, p. 1). Thereafter, records reveal that Plaintiff made no medical complaints during subsequent sick calls on October 27, 2010, December 15, 2010, or December 29, 2010 (*Id.* at 2-4). There are no medical records that would indicate that Plaintiff had any notable injury or medical condition that resulted from the pellets/fragments. There is no showing that any of Plaintiff's daily activities were dampened or effected after the incident. At most, Plaintiff had a few welts on his arm and a nosebleed that had stopped by the time Defendant Thompson appeared.

There is also no showing that Defendant Thompson was deliberately indifferent. Plaintiff states that asked Defendant Thompson to give him medical care after the shooting. She stated that she would after her rounds. When she returned, Plaintiff showed her bloody tissue and t-shirt, and pointed out welts on his arm. Tellingly, there is no indication Plaintiff was actively bleeding, that the welts were significant in size or color, that there were any physical signs that a pellet/fragment was stuck inside his nose, or that he expressed that he was in any severe pain. Defendant Thompson in her affidavit indicated that she did not observe visible injuries or any evidence that

Plaintiff had been shot. If Plaintiff is credited, Defendant Thompson merely told Plaintiff to wash up. Such an interaction does not display deliberate indifference: Defendant Thompson observed Plaintiff and did not see any cause for concern. Defendant Thompson's actions do not rise to constitutional violation.

Plaintiff has failed to show that Defendants violated his constitutional rights and they are entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that in determining whether Defendants are entitled to qualified immunity, the Court must consider two questions: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and, 2. was "the right clearly established?"); *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *See also Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012).

Conclusion

Defendants' motion for summary judgment (Doc. 32) is **GRANTED.** Judgment will enter for Defendants and this case shall be closed.

**IT IS SO ORDERED.**

**DATED**: November 26, 2013

s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge